# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CARMELO VALDEZ ROMERO,<br><br>Defendant. | NO. CR20-4051-LTS-KEM<br><br>**BRIEF IN SUPPORT OF RENEWED MOTION FOR JUDGMENT OF ACQUITTAL** |

Defendant, Carmelo Valdez Romero, through counsel, submits the following brief in support of his Motion for a Judgment or Acquittal under Fed.R.Cr.P. Rule 29.

## TABLE OF CONTENTS

I. INTRODUCTION……………………..……………………………1

II. STANDARD OF REVIEW………………..…………………………..2

III. FACTUAL BACKGROUND……………………………………………3

IV. ARGUMENT

    A. The Court should grant Mr. Valdez's renewed Motion for Judgment of Acquittal………………………………………………………………7

V. CONCLUSION………………………………………………...……..10

## I. INTRODUCTION:

At the conclusion of the Government's case-in-chief, Defendant, Carmelo Valdez Romero (hereafter "Mr. Valdez" or "Carmelo") moved for a judgment of acquittal under Rule 29. Mr. Valdez renewed the Motion at the close of Defendant's case-in-chief. The Motions were denied.

1

Counts 1 and 4 were submitted to the jury. The jury returned a split or mixed verdict, that being a verdict of guilty to Count 4 -Possession with intent to distribute methamphetamine on March 17, 2020, or aiding and abetting the same, and an acquittal on Count 1-Conspiracy to Distribute Methamphetamine. Significantly, the verdict reflects the fact the jury rejected, at least in large part, the testimony of the cooperating witnesses, as well as evidence surrounding the activities at the Lake Park residence on March 17, 2020. The verdicts reflect inconsistent findings of fact and support the reasons to grant Mr. Valdez's Rule 29 Motion.

II.  **STANDARD OF REVIEW**

Federal Rules of Criminal Procedure 29 provides in relevant part:

> "The court on a motion of the defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense." Fed.R.Crim.P. 29(a)

While the evidence and all reasonable inferences therefrom must be taken in light most favorable to the verdict, the sufficiency in this case lacked. *United States v. Butler,* 238 F.3d 1001, 1003 (8th Cir. 2001). This court may overturn a jury's verdict upon a finding that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof on one of the essential elements of the offense charged. *United States v. Davis*, 103 F.3d 660, 667 (8th Cir. 1996).

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The defendant may renew any such motion after trial, in which case the court may set aside the verdict

and enter a judgment of acquittal. Fed. R. Crim. P. 29(c). The Court must grant a motion for judgment of acquittal if no "reasonable-minded jury" could find proof beyond a reasonable doubt of the defendant's guilt. *See United States v. Walker*, 917 F.3d 1004, 1011 (8th Cir. 2019). In assessing whether to enter a judgment of acquittal notwithstanding the verdict, a court generally must defer to the jury's credibility assessments. *See United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004).

### III. FACTUAL BACKGROUND

The trial presentation by the Government in this case centered on the controlled purchase of one pound of methamphetamine from Delfina ("Janet") Torres-Perez on or about March 10, 2020 and the seizure of approximately twenty pounds of methamphetamine from various vehicles and from a machine shed in Lake Park, Iowa on March 17, 2020.

The government's case focused on the seizures and controlled purchases of methamphetamine from its primary target, Janet Torres. The testimony at trial related primarily to a controlled buy from Janet on March 10, 2020, a controlled buy from Janet on March 17, 2020, and the surrounding activities and seizures of methamphetamine around the Lake Park, Iowa acreage. Law enforcement testimony offered less direct evidence to Mr. Valdez's role or involvement. The Government attempted to prove Mr. Valdez's involvement through several cooperating witnesses. These cooperating witnesses testified to the activities on March 17, 2020, as well as their involvement at various meetings that occurred between the two controlled purchases. The Government theory appearing to be that Mr. Valdez was a knowing aider of Janet's distribution of methamphetamine and more pointed that he was a knowing aider of the California

3

trip to secure twenty pounds of methamphetamine to return to NW Iowa where it was unloaded from a Mitsubishi Outlander. This would then culminate the government's theory that Mr. Valdez was a knowing aider and conspirator to the activities in the machine shed at Ruby Blankenship's acreage on March 17, 2020.

Agent Ben Gill testified the investigation in this case began at the end of February 2020 when government cooperators Bill Hageman and Kerri Hageman (nee Delgado) told Agent Gill that Janet was a potential target. (TT I, p. 52-53).[1] Following this information, agents set up a controlled purchase of methamphetamine from Janet on March 10, 2020 (TT I, p. 56). Agents were successful in purchasing one pound from Janet for $5,000 inside the Hobby Lobby in Sioux City, Iowa. (TT I, pp. 59-61). During this purchase on March 10, 2020, Mr. Valdez was in the parking lot of the Hobby Lobby, sitting in the passenger seat of Janet's vehicle. (TT II, p. 147). Agent Gill testified that Mr. Valdez did not enter the Hobby Lobby or have any contact with the cooperators. He testified that Janet shopped in the Hobby Lobby for about 40 minutes and when she exited Mr. Valdez helped her load her Hobby Lobby purchases into the vehicle and then went about normal activities around Sioux City. (TT II, pp. 147-149, Exhibits. D, E, and F).

Agent Gill testified that Mr. Valdez was never mentioned by cooperators Bill or Kerri Hageman nor was any information or intelligence gathered about him before March 17, 2020. (TT II, p. 145). The testimony throughout trial was that Mr. Valdez was not engaged in the sale, possession, distribution, or use of methamphetamine with any of the government cooperating

---

[1] TT refers to trial transcript and I, II, III, or IV refer to the volume, p. refers to the page number.

witnesses (TT III, pp. 391-392, p. 442, 486, and 522). Agent Gill also testified there was no electronic communications or other communications between Mr. Valdez and any other witnesses or parties to the charged conspiracy. (TT II, pp. 158-159). This included all times between March 10, 2020 and March 17, 2020 wherein the cooperating witnesses testified to Mr. Valdez's presence, involvement, and/or participation in various planning meetings.

The government presented testimony regarding several meetings that occurred between the March 10, 2020 controlled buy and the Las Vegas/California trip that Janet and Dustin Nobel took. The government presented the testimony of Ruby Blankenship who said Mr. Valdez engaged in a meeting and conversation with Janet, Dustin Noble, and herself about a trip to Las Vegas or California. Her testimony was that during the meeting Mr. Valdez participated in discussions of specifics of sleeping arrangements and money to pay for a custody case. She also testified there were specific discussions with Mr. Nobel and Janet with Mr. Valdez present about details of methamphetamine quantities and delivery. (TT II, pp. 263-266). Mr. Noble testified that Mr. Valdez did not say very much during this meeting but was present for the planning (TT III, p. 348). But Mr. Noble testified no discussion of acquisition of methamphetamine or specifics were discussed. (TT III, p. 385).

Ms. Blankenship testified that Dustin Noble set up or middled a one-pound transaction of methamphetamine between Janet and Mr. Valdez and Jared Wolthuis. (TT II, p. ). Ms. Blankenship testified that Mr. Valdez and Janet came to her house to pick up Dustin Noble to then transport one pound of methamphetamine to Mr. Wolthuis. (TT II, p. 267). This testimony was disputed by Mr. Noble. (TT III, pp. 344-345, 381-382). This was also testified to by Mr. Wolthuis

5

who testified this encounter was in two stages and the delivery occurred 2 or 3 days after the 'second' meeting. (TT III, pp. 419-420). Ms. Renken stated Janet brought it not Dustin, but indicated it was all in the same day. (TT III, p. 471). All four witnesses, Blankenship, Wolthuis, Renken, and Noble each testified differently and inconsistently regarding the terms, parties, present, dates, and details of the alleged second meeting. The jury would have heard varying descriptions of meetings, but the government focused the cooperators'' testimony on Mr. Valdez and the presence of his dog. (TT II, p. 280, TT III, pp. 301, 306, 414, 417, 420, and 471). Finally, cooperator Renken testified that following the March 17, 2020 search, all of the cooperating witnesses met together in Worthington, Minnesota to discuss each of their roles and experiences before engaging in their cooperation. (TT III, p. 492).

    The government offered testimony through Mr. Noble that he participated in driving with Janet from California to Lake Park. Mr. Noble testified they flew from Sioux Falls to Las Vegas and then drove a rental care to California then back to Lake Park. (TT III, pp. 352-360). Mr. Noble testified that Colorado police conducted a thorough search of the rental car and that is when he learned from Janet about the presence of methamphetamine in the vehicle. (TT III, p. 358, 385). Mr. Noble also testified about the travels back from California to Lake Park, Iowa and his eventual knowledge of methamphetamine in the car. (TT III, pp. 358-361). Various government exhibits, namely several 'Ring doorbell' videos showed the activities outside of a barn/shed/machine shop on March 17, 2020. (Exhibits 201-223). Mr. Noble testified that after arriving at the acreage and after showering, he then went to the machine shed to remove methamphetamine from the gas tank. (TT III, p. 363). Mr. Noble testified about extracting packages from a gas tank and that Mr. Valdez

6

participated in this process. (TT III, pp.365-370). Mr. Noble testified that the packages were Cryovaced and coved in duct tape. (TT III, pp. 367, 387-388, Ex. 155). He testified then about the manner in which he placed them in buckets and that others took off the packaging. (TT III, pp. 370-371). Mr. Renken testified that Janet and her removed the duct tape and Janet put the packages in the safe. (TT III, pp. 475-476).

No government witness testified Mr. Valdez was told what was in the packages. (TT III, p. 388). Agents as well as others testified that you could not see inside the package as it would have come out of the gas tank. (TT II, p. 196). Mr. Noble testified he had never bought or sold methamphetamine from Mr. Valdez nor had any knowledge of Mr. Valdez having any participation in methamphetamine. (TT III, pp. 391-392). Mr. Noble, like the other cooperators never discussed methamphetamine with Mr. Valdez nor what was in the packages. (TT III, p. 388). Unlike the various cooperating witnesses, Agent Gill testified that Mr. Valdez provided no financial assistance or support for the flight to Las Vegas or expenses during trip from Iowa to California and back. (TT II, p. 160).

Agent Gill testified that Mr. Valdez was pulled over by a State Trooper and during that encounter money used in the purchase of methamphetamine was seized from Janet, Mr. Valdez, and Janet's juvenile daughter (Rosie). (TT II, pp. 103-105). The serialized money seized from Mr. Valdez and Rosie were in equal amounts. (TT II, p. 106, p. 154). Agent Hogue testified that during the traffic stop Janet informed officers there was one pound of methamphetamine in the Outlander, and it was found in a hair dryer box. (TT II, p. 205). Agent Hogue further testified that Janet told him the methamphetamine was hers. (TT II, p. 205, p. 209). During the traffic stop Mr.

7

Valdez's phone was voluntarily provided to agents. (TT II, pp. 210-211). Testimony from agents confirmed that there was no communication between Mr. Valdez and the various cooperators and communication between Mr. Valdez and Janet was not of evidentiary value. TT II, pp. 158-159).

After the traffic stop, Mr. Valdez was released to return the Outlander to the rental company. (TT II, p. 152). During Mr. Valdez's encounters with agents and officers he was cooperative. (TT II, p. 208).

## IV. ARGUMENT

### A. The Court should grant Mr. Valdez's renewed Motion for Judgment of Acquittal

The jury, in this case, returned a mixed and inconsistent verdict. As previously stated, and known to the Court, the jury acquitted Mr. Valdez of conspiracy to distribute methamphetamine while returning a guilty verdict for possession with intent to distribute or aiding and abetting possession with intent to distribute methamphetamine. This verdict reflects the jury rejected, at least in part, the testimony of the multiple cooperators and surrounding evidence secured from the March 17, 2020 investigation at Lake Park, Iowa. The jury unreasonably accepted, in part, the government's theory of Mr. Valdez's role in this overall case, that he was a knowing facilitator or aider of Janet and others. It was unreasonable for the jury to render the verdicts because the government's theory of Mr. Valdez was identical for both charges.

A reasonable juror would not have discounted the wide variety of narratives from the various cooperators regarding the planning meetings and that the cooperators all met up following the raid to discuss or compare their narratives. A reasonable juror would have noted the shifting and changing testimony of multiple cooperators as to what their involvement was and what Mr.

8

Valdez's was.  But a reasonable juror could not accept the testimony of the cooperators that Mr. Valdez aided and abetted or personally possessed with intent to distribute on March 17, 2020 but also did not partake in the planning stages and dealing one pound of meth and other activities in the week prior.  The essential theory of the government's case was that Mr. Valdez conspired with the cooperators and aided them from March 10 through March 17 and the did so again in Lake Park on March 17.  It would be unreasonable for a juror to accept the testimony of cooperators and find a lack of a knowing conspiracy in the March 10-17 activities while simultaneously finding he knowingly aided and abetted or possessed with intent to distribute on March 17, 2020.

A reasonable juror would have noted the testimony of agents and cooperators that Mr. Valdez had no communication with the various cooperators and that agents had no information on any financial or other support of the California trip.  A reasonable juror would have similarly heard testimony that no cooperator told Mr. Valdez what was in the packages nor what the packages were for or where they were going.  A reasonable juror would have heard there was no physical evidence connecting Mr. Valdez to any packages.   A reasonable juror would have heard from multiple witnesses that Mr. Valdez had never bought or sold any controlled substances.  A reasonable juror would have heard that no witness had ever used controlled substances with Mr. Valdez nor had any knowledge of his use of controlled substances.

Pointedly, Dustin Noble's testimony, to the extent believed, was that Mr. Valdez initiated the removal of seats from the vehicle, and removed the carpet, but that he removed the packages.  His testimony was that the only statement Mr. Valdez made was "this bitch is crazy." (TT III, p. 373). Otherwise, Mr. Noble's only testimony about Mr. Valdez is that they used hand signals and

did not communicate as to what was occurring while Mr. Noble extracted packages from the gas tank. Simply stated, a reasonable juror could not find that Mr. Valdez had the requisite knowledge of the specific contents of the packages nor what the purpose was in the activities of March 17, 2020.

A reasonable juror would have heard Agent Hogue testify that Janet told agents the methamphetamine was hers. Several witnesses testified regarding Janet being in charge or leading, but despite this, there was no testimony about communications or directives from Janet to Mr. Valdez. A reasonable juror could not find that he knowingly possessed with intent to distribute or aided the possession with intent to distribute based on the lack of directives to him while simultaneously finding he did not conspire with them to distribute. As the government stated in closing and what was central to its theory, the best evidence of the conspiracy to distribute was the actual distribution. The inconsistency in the jury verdict is central to why a reasonable juror could not find Mr. Valdez knowingly possessed with the intent to distribute or aided and abetted in it but did not knowingly conspire to distribute the same controlled substance.

## V. CONCLUSION

For all of the foregoing reasons and based on the inconsistency in the verdict and the lack of proof from the government on Mr. Valdez's knowledge, the Motion for Judgment of Acquittal should granted.

Respectfully submitted,

By _____*/s/ Jared R Weber*_____
    Jared R. Weber, #23890
    ICIS #: AT0009177
    PO Box 412
    Orange City, IA 51041
    (712) 737-3887
    (712) 737-3886-fax
    jared@weberlawiowa.com
    ATTORNEY FOR DEFENDANT

Original filed.
Copy: AUSA-Wehde

| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on 4/8/22 |
|---|
| By: ☐ U.S. Mail ☐ FAX<br>☐ Hand Delivered ☐ EDMS<br>X CM/ECF ☐ Other: Email |
| Signature\_\_/s/ Jared R Weber_____ |